**UNITED STATES, Appellee,**

v.

**Stephen TSE, Defendant—Appellant.**

**No. 97–1103.**

United States Court of Appeals,
First Circuit.

Heard Oct. 7, 1997.

Decided Feb. 3, 1998.

Rehearing and Suggestion for Rehearing
En Banc Denied Feb. 25, 1998.

Martin G. Weinberg, with whom Oteri, Weinberg & Lawson, Kimberly Homan, Sheketoff & Homan and Kevin O'Dea, Boston, MA, were on brief, for appellant.

Demetra Lambros, Attorney, U.S. Department of Justice, Washington, DC, with whom Donald K. Stern, United States Attorney, Susan Hanson–Philbrick and June C. Seray-dar, Assistant United States Attorneys, Boston, MA, and Nina Goodman, Attorney, Department of Justice, Washington, DC, were on brief, for appellee.

Before STAHL, Circuit Judge, GODBOLD * and CYR, Senior Circuit Judges.

GODBOLD, Senior Circuit Judge.

Stephen Tse appeals from his conviction under 18 U.S.C. § 1959(a)(5) for attempted murder and conspiracy to murder two men, Chao Va Meng and Dai Keung. He was sentenced to 188 months.

### Factual Background

The jury was entitled to find the following facts, either undisputed or based on sufficient evidence. During the 1980s Tse was the leader of a powerful crime organization in Boston called Ping On. Ping On had ties to criminal organizations in Hong Kong. It initiated its members in a ritualistic ceremony in which they pledged loyalty and allegiance to the group and each other. Meng and Keung were members of a rival gang. Ping On was involved in a number of criminal activities including illegal gambling operations, extortion, and violent crimes such as assault and attempted murder.

The events leading up to the attempted murders of Meng and Keung were as follows. Tse was away from Boston for a period of time between 1984 and 1986. When he returned he was dissatisfied because rival gangs had infiltrated Ping On territory and were threatening his dominance. A particular circumstance that bothered him was that Meng and Keung were demanding money from one of his gang members, Albert Cheung. Meng and Keung claimed that Cheung owed them money because they had paid him for phony green cards[1] that were never delivered. Keung was also attempting to collect money from another Ping On member, Kwok–Wah Chan, for a cocaine debt. Tse believed that these demands on mem-

---

* Of the Eleventh Circuit, sitting by designation.

1. Cheung was involved in an immigration scam selling fake immigration papers and green cards to illegal aliens for $5,000 each. Sometimes these aliens actually received cards and sometimes they did not.

bers of his gang were indirect attacks on the preeminence of his organization and on him. He became increasingly enraged at the actions of several rival gangs as they began to show signs of force within Ping On's territory. On December 29, 1988 things came to a head, and Tse ordered Jimmy Soo Hoo and Kwok–Wah Chan, members of Ping On, to kill Meng and Keung. Tse located Meng and Keung, obtained weapons for Soo Hoo and Chan, and directed them to "do it smart." After a thwarted attempt, Soo Hoo and Chan finally found Meng and Keung in front of a gambling den. They positioned themselves in an adjacent parking lot and opened fire for between 30 seconds and a minute, but they missed their targets.

On December 21, 1993 a multi-count indictment was returned against Stephen Tse charging him with various federal crimes. Counts 1 and 2: participating in a RICO conspiracy and substantive offenses related to this conspiracy in violation of 18 U.S.C. § 1962(c) & (d); Counts 3 and 4: operating an illegal gambling business in violation of 18 U.S.C. § 1955; Count 7: making an extortionate extension of credit in violation of 18 U.S.C. § 892(a); Count 9: conspiracy to bring aliens into the United States in violation of 8 U.S.C. § 1324; Counts 12 and 13: assault with a dangerous weapon in violation of 18 U.S.C. § 1959(a)(3); Counts 14 and 15: attempted murder in aid of a racketeering enterprise in violation of 18 U.S.C. § 1959(a)(5); Count 16: conspiracy to commit murder in aid of a racketeering enterprise in violation of 18 U.S.C. § 1959(a)(5); and Count 17: using and carrying a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c).

In February 1994 the United States sought extradition of Tse from Hong Kong on Counts 12 through 17.[2] The request was referred to a Hong Kong magistrate. An Assistant United States attorney who was handling Tse's prosecution submitted addi-

tional affidavits on March 31, 1994, to support the murder conspiracy charge alleged in Count 16. In one of the affidavits she stated that the United States was seeking extradition "at this time only on Count 16." After an evidentiary hearing the magistrate committed Tse to the Hong Kong authorities to be extradited to the United States to stand trial on the conspiracy to murder charge contained in Count 16.

The United States government proceeded against Tse solely on Count 16, and Tse entered an agreed guilty plea to this charge. The district court rejected the plea agreement, and Tse withdrew his plea. After this withdrawal the Consul General of the United States presented a diplomatic note to the Governor and Government Secretariat of Hong Kong on May 20, 1996 explaining that new evidence had been discovered and requesting permission to prosecute Tse on the attempted murder charges alleged in Counts 14 and 15. The Consul General received a note from the Government Secretariat of Hong Kong consenting to this request. Tse was then tried by jury on Counts 14 through 16. The jury returned a guilty verdict on all three Counts.

Tse appeals.

### Discussion

#### A. Tse's extradition and the principle of specialty.

 Tse contends that the district court erred by denying his motion to dismisss 14 and 15 because he was not extradited on those Counts. Tse urges that by trying him for offenses other than the one listed in the amended extradition request the district court violated the doctrine of specialty. The doctrine of specialty is grounded in international comity and generally requires that a requesting country not prosecute a defendant for offenses other than those for which extradition was granted. See U.S. v. Saccoccia, 58

**2.** The extradition request was made pursuant to the Extradition Treaty between the Government of the United States and the Government of the United Kingdom of Great Britain and Northern Ireland, June 8, 1972, 28 U.S.T. 227, as amended by the Supplementary Treaty Between the Government of the United States and the Govern-

ment of the United Kingdom of Great Britain and Northern Ireland, June 25, 1985, T.I.A.S. No. 12,050. This extradition treaty was made applicable to Hong Kong by an exchange of diplomatic notes on October 21, 1976. 28 U.S.T. at 238–241.

F.3d 754, 766 (1st Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1322, 134 L.Ed.2d 474 (1996). "A district court's interpretation of the principle[ ] ... [of] specialty traditionally involves a question of law and is, therefore, subject to plenary review in the court of appeals." *Id.* at 767.

■ The government contends that Hong Kong waived the rule of specialty by consenting to Tse's prosecution in the written note responding to the Consul General's request. The note from the Government Secretariat of Hong Kong stated:

> [t]he offences of conspiracy to murder and attempted murder are both extraditable offences within the meaning of Article III of the Treaty and are offences established by the facts in respect of which extradition was granted within the meaning of Article XII of the Treaty. There accordingly can be no objection to ... Tse being prosecuted in the United States of America for the offences which comprise Counts 14, 15, and 16 of [the indictment], namely the offences of attempted murder of Chao Va Meng and Dai Keung and conspiracy to murder Chao Va Meng and Dai Keung.

Because the doctrine of specialty is concerned with comity rather than the rights of the defendant, "the protection [of specialty] exists only to the extent that the surrendering country wishes." *U.S. v. Najohn,* 785 F.2d 1420, 1422 (9th Cir.1986); *accord Shapiro v. Ferrandina,* 478 F.2d 894, 906 (2d Cir.1973).[3] If Hong Kong consented to the prosecution of Counts 14 and 15 Tse's position must fail.

Tse challenges the validity of Hong Kong's consent by suggesting that the letter is not from the proper authority because it is unsigned and does not indicate which department of the Government Secretariat prepared it. Moreover, he asserts that the Government Secretariat is not of consular status and has no authority to interpret the extradition treaty. Despite Tse's assertions the note appears to be an official response

from the Hong Kong government, and this court has no power to require Hong Kong to follow a particular procedure in granting a diplomatic request. *See Najohn,* 785 F.2d at 1423 (Because defendant did not "obtain a Swiss judgment prohibiting Swiss consent to further prosecution we are justified in regarding the statement of the [Swiss] executive branch as the last word of the Swiss government" even though the Swiss government's consent to further prosecution was not court-approved like the order of extradition.).

■ Even if the diplomatic note from Hong Kong did not serve to waive the doctrine of specialty, the conduct underlying the attempted murder charges was sufficiently similar to that of the conspiracy charge to comport with the doctrine. "The inquiry into specialty boils down to whether ... the surrendering state would deem the conduct for which the requesting state actually prosecutes the defendant as interconnected with (as opposed to independent from) the acts for which he was extradited." *Saccoccia,* 58 F.3d at 767; *see also U.S. v. Sensi,* 879 F.2d 888, 895–96 (D.C.Cir.1989) ("What the doctrine of specialty requires is that the prosecution be based on the same facts as those set forth in the request for extradition.") (internal quotation and citation omitted). In the present case the facts used to prove the attempted murder charges were identical to those in the conspiracy charge. Both charges arose out of a single chain of events that culminated in the shootout on December 29, 1988. Article XII of the treaty between Hong Kong and the United States forbids prosecution for "any offense other than an extraditable offense established by the facts in respect of which his extradition has been granted." 28 U.S.T. 227, 233. This language recognizes that a single set of facts can give rise to more than one extraditable offense and that the treaty allows prosecution for those offenses, even if they were not specifically mentioned in the extradition document.

---

**3.** We do not suggest that a criminal defendant cannot raise the issue of specialty. The government has not raised the issue of standing, and we do not reach it. We only note that the doctrine does not extend any independent protection to

the defendant. *See Saccoccia,* 58 F.3d at 767 n. 6 (declining to reach the issue of standing because the issue was more easily dismissed on the merits but noting that "the side that favors individual standing has much to commend it").

The prosecution of Tse for attempted murder did not violate the doctrine of specialty.

**B. Jury instruction on purpose of the crimes.**

 Tse asserts that the court's jury instruction on the purpose of the crimes was in error. The judge charged that for Tse to be convicted under § 1959(a) it must find that Tse conspired and/or attempted murder for the purpose of maintaining his position in the enterprise. *See* 18 U.S.C. § 1959(a). The court further instructed the jury that this maintenance of position need not be Tse's sole or principal motive and that the prosecution could satisfy its burden by proving that Tse committed the acts because "he knew it was expected of him by reason of his membership ... or that he committed the ... acts in furtherance of that membership." Tse objected, asserting that the jury must find that maintenance of position in the enterprise was his sole or principal motive. Because Tse challenges the district court's interpretation of § 1959(a) rather than only the wording of the instruction, our review must be de novo. *See U.S. v. Pitrone*, 115 F.3d 1, 4 (1st Cir.1997) ("When ... the alleged error involves the interpretation of the elements of a statutory offense, it poses a question of law and sparks plenary review.").

The Second and Fourth Circuits have held that § 1959 does not require the government to prove that increasing or maintaining position in an enterprise be the sole or principal motive in committing a crime for conviction under § 1959. *See U.S. v. Fiel*, 35 F.3d 997, 1004–5 (4th Cir.1994); *U.S. v. Concepcion*, 983 F.2d 369, 380 (2d Cir.1992). In *Concepcion* the defendant was a member of a narcotics enterprise known as the Unknown Organization. The evidence showed that Concepción killed and conspired to kill individuals who were members of rival gangs and individuals who made demands on his gang. *Id.* at 375–76. Concepción asserted that the prosecution must prove that he had the specific intent of maintaining his position in the enterprise to secure a conviction under § 1959. *Id.* at 380. The court rejected this contention, noting that the legislative history of § 1959 indicated that, with

regard to purpose, Congress meant to proscribe all violent crime committed as an aspect of membership in a racketeering organization. *Id.* at 381; *see also* S.Rep. No. 225, 98th Cong., 1st Sess. 304–07 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3483–87. In other words, the *Concepcion* court stated, the crime need only have been committed in furtherance of the defendant's membership in the enterprise or because it was expected of him by reason of his membership. *Concepcion*, 983 F.2d at 381.

We agree with the Second and Fourth Circuits. By enacting § 1959 Congress intended to curtail the violent criminal activity that is often associated with racketeering enterprises. *See* S.Rep. No. 225, 98th Cong., 1st Sess. 304–07 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3483–87. Nowhere does the statute or its legislative history indicate that the government must prove that the crime was solely motivated by a desire to maintain or increase a particular position within the enterprise. The evidence showed that Tse ordered the attempted murders of Meng and Keung because they had threatened the security and supremacy of his leadership and of his enterprise. By instructing the jury that Tse's general motive must have been the maintenance of his position in the organization, and that he acted to further his membership in the enterprise, the district court correctly applied the requirements of § 1959.

**C. *Pinkerton* instruction**

 The district court instructed the jury that it could find Tse responsible for his co-conspirators' crimes of attempted murder under the theory announced in *Pinkerton v. U.S.*, 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946). *Pinkerton* declared that when a criminal conspiracy is proven to exist each member can be charged with the foreseeable substantive crimes of his co-conspirators, even if he did not actually participate in the crimes himself. *Id.* Tse contends that a *Pinkerton* instruction is not proper in prosecutions under § 1959 because it negates the necessity of finding that he acted with an intent to maintain or increase a position in an enterprise. This assertion ignores the pre-

cept on which *Pinkerton* liability is based, that the necessary "criminal intent to do the act is established by the formation of the conspiracy." *Id.* In this case before the jury could find Tse guilty of the attempted murders alleged in Counts 14 and 15, it had to find him guilty of the conspiracy to commit murder alleged in Count 16. To do this the jury necessarily had to find that Tse conspired to murder for the purpose of maintaining his position. If Tse possessed the requisite intent when he entered into the conspiracy then all foreseeable crimes committed by the conspiracy can be attributed to that intent. Furthermore, the court also instructed the jury that it could not find Tse guilty under a *Pinkerton* theory unless it found that he could have reasonably foreseen that the attempted murders might be committed by his co-conspirators. There was no error in the court's utilization of a *Pinkerton* instruction.

**D. Admission of co-defendant's guilty plea.**

▮ Tse urges that the guilty plea of co-conspirator Kwok–Wah Chan was introduced improperly as substantive evidence of his guilt. One of Tse's defense strategies suggested that the crimes committed were ordinary street crimes punishable by state law rather than violent crimes in aid of a racketeering enterprise. Tse contends that by introducing Chan's guilty plea to the aiding racketeering charge and giving the jury a *Pinkerton* instruction the government used Chan's plea improperly, i.e., because Chan pleaded guilty to the charge he admitted that his motive was furthering the enterprise, and under *Pinkerton* Chan's motive could be attributed to Tse and considered as evidence of Tse's guilt. Several factors work to counteract Tse's assertions on this issue.

▮ First, Tse did not object to the introduction of Chan's plea. To reverse on this issue we must find plain error. Fed. R.Crim.P. 52(b). Second, Chan's guilty plea was properly elicited on direct examination to counteract the anticipated attack on Chan's credibility by Tse. Tse's strategy included attacking the credibility of each government witness. The prosecution preempt-

ed Tse by having each witness admit past criminal behavior and any plea agreements that could have motivated the witness to testify. A co-conspirator's guilty plea is properly "elicited to dampen the effect of an anticipated attack on the witness's credibility." *U.S. v. Dworken,* 855 F.2d 12, 30 (1st Cir.1988). Furthermore, on cross-examination Tse attempted to show that Chan had been coerced into pleading guilty. On redirect the government extracted further detail about the specific crimes Chan had pled to and asked him to verify that he had committed them. Therefore, this testimony damaging to Tse came in response to his cross-examination attacking the integrity of Chan's plea. *See U.S. v. Kroh,* 915 F.2d 326, 332 (8th Cir.1990) (use of redirect to elicit plea is proper to combat suggestions made by defense in cross-examination); *U.S. v. Braidlow,* 806 F.2d 781, 783 (8th Cir.1986) ("The trial court does not abuse its discretion by allowing the use of evidence on redirect examination to clarify an issue that was opened up by the defense on cross-examination—even when this evidence would otherwise be inadmissible.").

▮ Third, the court gave a cautionary instruction regarding the guilty pleas. The judge instructed the jury that Chan's guilty plea could not be considered as evidence of Tse's guilt. We consider such an instruction in weighing claims of prejudice by defendants. *See U.S. v. Rivera–Santiago,* 872 F.2d 1073, 1084 (1st Cir.1989) ("Evidence of ... guilty pleas is amenable to misuse. Without instruction, it is possible the jury could use the pleas as evidence of ... guilt. This danger may be averted only by adequate cautionary instructions....").

Because Chan's plea was used properly to counteract the defendant's credibility attack and because the court gave an adequate cautionary instruction, we find no plain error.

**E. Admission of other criminal activities.**

▮ Before trial Tse filed a motion in limine asking the court to exclude the government's evidence of uncharged prior criminal activity. The court denied the motion. Tse urges that this denial was error under

Federal Rule of Evidence 403.[4] He says that any probative value of the evidence was substantially outweighed by its extremely prejudicial effect. We review the balancing of probative value against prejudicial impact under Rule 403 for abuse of discretion, "bearing in mind that the limitations of Rule 403 are to be rarely invoked." *See U.S. v. Bartelho,* 71 F.3d 436, 443–44 (1st Cir.1995) (internal quotations omitted).[5] Tse also asserts that the district court erred in admitting evidence of the subsequent crime of trying to smuggle aliens into the United States to aid Ping On.[6]

■ The government contends that the evidence of Tse's other criminal acts had probative value. To prove Tse guilty of violating § 1959(a)(5) the government was required to prove that Ping On was an enterprise and that it engaged in racketeering activity as defined by 18 U.S.C. § 1961(1). Section 1961 defines racketeering activity as acts indictable under provisions of the United States Code such as robbery or extortion interfering with commerce or running an illegal gambling business. *See* 18 U.S.C. § 1961(1)(B). Furthermore, the government was required to prove that Tse committed the crimes to maintain his position in the enterprise. 18 U.S.C. § 1959(a). These evidentiary burdens made evidence of Tse's prior and subsequent criminal activity probative. *See U.S. v. Salerno,* 108 F.3d 730, 738–39 (7th Cir.1997) (deeming evidence of defendant's prior and subsequent crimes with accomplices as probative of the enterprise element of 18 U.S.C. § 1959).

Tse contends that he did not contest the existence of an enterprise or whether the enterprise engaged in racketeering activity;

however, no stipulations to these elements were entered, and no concessions were made at trial. In addition, Tse's brief acknowledges that one of his defense strategies was to paint the attempted murders as ordinary state-law street crimes rather than federally punishable violent crimes in aid of a racketeering enterprise. This acknowledgment highlights the government's need to prove the existence of a racketeering enterprise. We cannot fault the government for trying to conclusively prove every element of the charged offense. If it had done less we would be hearing a challenge to the sufficiency of the evidence.

While the evidence of Tse's prior and subsequent criminal acts may have been prejudicial, any prejudice did not substantially outweigh its probative value. The district court did not abuse its discretion in denying Tse's motion in limine.

## F. Admission of co-conspirators' statements.

■ Tse contests the admission of two hearsay discourses. One set of statements was made by Jimmy Soo Hoo, one of the actual shooters, the morning after the attempted murders. The statements were made to Albert Cheung, the gang member who owed the debt that caused Tse to order the killings. Cheung testified about the conversation. During the discussion Soo Hoo related the events of the previous night, speculated on police investigation, reassured Cheung about his safety, and indicated that the dilemma was not resolved and that further action would have to be taken. The government asserts that these statements

---

4. Tse does not challenge the evidence under Federal Rule of Evidence 404(b), which disallows evidence of other crimes or bad acts to prove character or a propensity to act in a criminal way. He specifically limits his challenge to the prejudicial quality of the evidence.

5. The government points out that Tse did not object to the admission of most of the evidence he now challenges. To raise and preserve for review a Rule 403 issue a party ordinarily cannot rely on the denial of a motion in limine but must object to the admission of the controversial evidence in the actual trial setting. *U.S. v. Griffin,* 818 F.2d 97, 105 (1st Cir.1987). Tse's failure to

object normally would require plain error review. However, because he did object to at least two pieces of evidence and because we find no error under either standard we will proceed under abuse of discretion review.

6. *Tse is unclear on whether he challenges this admission under Rule 401 for relevancy or under Rule 403 for prejudice. We find it relevant under Rule 401 in proving the existence of an enterprise and for proving Tse's purpose in committing the charged crimes. The evidence shows that Tse, as leader of the gang, was constantly trying to maintain his dominance.*

were not hearsay because they were statements made by a co-conspirator in furtherance of the conspiracy, making them admissible under Federal Rule of Evidence 801(d)(2)(E). Although Tse objected at the close of the evidence to the transcript of this conversation being given to the jury, he did not object at the time the conversation was offered into evidence and thus did not properly preserve this issue for appeal. *See U.S. v. Sepulveda,* 15 F.3d 1161, 1180 (1st Cir. 1993) (defendant must object to co-conspirator statement when offered to preserve objection to its admission); *U.S. v. Machor,* 879 F.2d 945, 951 (1st Cir.1989) (Without a proper objection to the statements introduced by the government, the court is not required to follow the usual procedure, which requires a specific finding by the judge that the government has proved all of the elements of Rule 801(d)(2)(E) by a preponderance of the evidence.). We review the district court's admission of the statements for plain error.

■■■■ Rule 801(d)(2)(E) requires that there be a conspiracy that involves the declarant and the defendant. The statement must be made during the course of and in furtherance of that conspiracy. Fed.R.Evid. 801(d)(2)(E); *Machor,* 879 F.2d at 951. Tse asserts two problems with the admission of Soo Hoo's statements. He contends that the statements were made after the conspiracy had ended and could not have furthered it. The content of the statements show the conspiracy had not ended. Soo Hoo said that things were "not resolved yet" and that he was waiting to see what the next steps would be. The content of the statements can be used to determine whether they are admissible under Rule 801(d)(2)(E) as long as other evidence tends to show that a conspiracy existed and that the declarant was a member. *Sepulveda,* 15 F.3d at 1182 ("Though the district court may consider a statement's contents and the circumstances attending its utterance when gauging the statement's reliability, admitting the statement into evidence requires some extrinsic proof of the declarant's involvement in the conspiracy.") (citation omitted). Also the statements furthered the conspiracy by reporting significant events to one of the co-conspirators. *See id.*

at 1180 (acknowledging that reporting past events advances a conspiracy).

■■■■ Tse also contends that the statements could not have served a conspiratorial purpose because they were made to a government informant. Numerous times we have accepted statements made to government informants as co-conspirator statements. *See, e.g., Machor,* 879 F.2d at 951; *U.S. v. Cresta,* 825 F.2d 538, 550 (1st Cir. 1987); *U.S. v. Paradis,* 802 F.2d 553, 560 (1st Cir.1986). And other circuits addressing this issue have held that the inquiry should focus on the declarant's intent, making the intent of the one who receives the information immaterial. *See U.S. v. Gutierrez,* 48 F.3d 1134, 1137 (10th Cir.1995); *U.S. v. Williams,* 989 F.2d 1061, 1068 (9th Cir.1993). Indeed the landmark Supreme Court case, *Bourjaily v. U.S.,* 483 U.S. 171, 173, 107 S.Ct. 2775, 2777–78, 97 L.Ed.2d 144 (1987), involved statements to a government informant.

Allowing Cheung's testimony of Soo Hoo's statement was not plain error.

■■■■ Tse also urges that the district court should not have allowed Howard Lo's testimony about the murder of Michael Kwong, Tse's second in command, in August of 1989. Lo testified about various conversations he had with members of Ping On concerning Tse's failure to return to Boston and speculating on whether Tse would order retaliation. Tse properly objected to this testimony, and we review the court's admission for abuse of discretion. *U.S. v. Garcia,* 983 F.2d 1160, 1172 (1st Cir.1993). Because the events and the conversations occurred eight months after the attempted murders and because Tse was in Hong Kong and had no intention of returning to Boston, we cannot find that the conversations occurred during the conspiracy. Therefore, Lo's testimony was not properly admissible under Rule 801(d)(2)(E). However, the admission of these statements constituted harmless error. The government did not imply that Tse had anything to do with Kwong's death or that he retaliated against those who did. Lo's testimony could not have affected the outcome of the trial. "In general, we review an evidentiary [ruling] . . . for harmless error, dismissing it if we determine that it is highly proba-

ble that the error did not contribute to the verdict." *U.S. v. Trenkler,* 61 F.3d 45, 60 n. 22 (1st Cir.1995) (citation and internal quotation marks omitted). Substantial legitimate evidence existed on which the jury could have based its verdict. It is highly improbable that a different verdict would have been reached in the absence of this testimony from Lo.

## Conclusion

We **AFFIRM** on all issues.